DONALD CHARETTE ET AL. *v.* CITY OF
WATERBURY ET AL.
(AC 23408)

Foti, Dranginis and Peters, Js.

Argued September 17—officially released November 18, 2003

*Elaine M. Skoronski,* for the appellants (named defendant et al.).

*Dana B. Lee,* for the appellees (plaintiffs).

PETERS, J. Pursuant to a collective bargaining agreement between a city and its unionized firefighters, firefighters who retire as a result of a disability are entitled to disability pensions measured as a percentage of their base pay at the time of retirement. They are also entitled to service pensions reflecting their years of service. Although the collective bargaining agreement expressly limits service pensions to reflect a base pay cap, the agreement does not expressly limit disability pensions. In this case, the city's retirement board decided that the firefighters' disability pension awards should be recalculated to correct prior pension payments that, in error, had failed to apply a base pay cap. The firefighters filed an administrative appeal to contest these recalculations, and the trial court sustained their appeal. We affirm the judgment of the court.

The principal focus of the administrative appeal filed by the plaintiff firefighters of the city of Waterbury (city) was the absence of evidentiary support of record for the decision of the Waterbury retirement board (board) to recalculate their disability pension benefits by subjecting those benefits to a pay cap. They also claimed that, as a matter of law, the board's decisions misconstrued the terms of the agreement with respect to this cap. The defendants, the city, various city officers, and the board and its commissioners,[1] defended the decisions of the board in both respects. The court sustained the plaintiffs' administrative appeal because

[1] The defendants at trial were the city of Waterbury, Palma Brustat (city pension and benefits administrator), Richard Russo (city director of finance), the city of Waterbury retirement board and its commissioners, and former Mayor Philip Giordano. The action was dismissed as against two of the commissioners, Jennie Pica and Genevieve Cavallerano, and Mayor Giordano due to untimely service of process, and they are not involved in this appeal. We refer in this opinion to the remaining defendants as the defendants.

of the absence of an evidentiary foundation for the board's recalculation of the plaintiffs' pensions.

In their appeal from this adverse judgment, the defendants have raised four issues. They argue that the court improperly ignored (1) the factual and legal underpinnings of the decision of the board, (2) the board's reasonable interpretation of the collective bargaining agreement, (3) the testimony of the city's pension administrator about the proper interpretation of the agreement and (4) the plaintiffs' burden of proving, as a matter of fact, that the city's interpretation of the agreement was incorrect. We are not persuaded. Because each of the issues raises a question of law, our review is plenary. *DeLeo* v. *Nusbaum*, 263 Conn. 588, 593, 821 A.2d 744 (2003).

I

The underlying facts are undisputed. Each of the plaintiffs is a retired firefighter who is presently collecting a pension in accordance with the collective bargaining agreement between their union and the city for the years 1995 to 1999. Each became entitled to retire on the ground of disability under General Statutes § 7-433c,[2] commonly referred to as the Heart and Hyperten-

---

[2] General Statutes § 7-433c provides in relevant part: "[I]n the event a uniformed member of a paid municipal fire department or a regular member of a paid municipal police department who successfully passed a physical examination on entry into such service, which examination failed to reveal any evidence of hypertension or heart disease, suffers either off duty or on duty any condition or impairment of health caused by hypertension or heart disease resulting in his death or his temporary or permanent, total or partial disability, he or his dependents, as the case may be, shall receive from his municipal employer compensation and medical care in the same amount and the same manner as that provided under chapter 568 if such death or disability was caused by a personal injury which arose out of and in the course of his employment and was suffered in the line of duty and within the scope of his employment, and from the municipal or state retirement system under which he is covered, he or his dependents, as the case may be, shall receive the same retirement or survivor benefits which would be paid under said system if such death or disability was caused by a personal injury which arose out of and in the course of his employment, and was suffered in the line of duty and within the scope of his employment. . . ."

sion Act. For a number of years, each of them received disability pension benefits greater than their base pay at the time of retirement.

On March 2, 2001, the city pension administrator informed them of the reduction of their disability pensions to take account of the base pay cap. On April 17, 2001, the board held a public meeting to consider the validity of the recalculation of the plaintiffs' disability pensions. On the record of the public meeting, the city presented no factual evidence to the board in favor of the recalculations. There has been no representation that the board received any such evidence in its subsequent executive session. At the conclusion of the executive session, without discussion on the record, the board approved the recalculation of the plaintiffs' disability benefits to reflect the applicability of the base pay cap.[3] The plaintiffs then filed their administrative appeal in the trial court.

The underlying disagreement about the proper calculation of the plaintiffs' disability pensions is easily identified. It stems from two provisions of the 1995-1999 collective bargaining agreement between the city and its firefighters. One set of provisions describes the calculation of service pensions, while a different provision describes the calculation of disability pensions. For retirees like the plaintiffs, who elected to have their service benefits calculated according to a so-called "Option One," service benefits were subject to a base pay cap. When these plaintiffs subsequently became eligible for disability retirement, they became eligible for disability pensions under a different section of the agreement, which did not expressly subject disability benefits to such a base pay cap. The recalculation of

---

[3] In the absence of the bargaining agreement, the plaintiffs' disability benefits under the Heart and Hypertension Act might have been modifiable. *Gauger* v. *Frankl*, 252 Conn. 708, 713, 752 A.2d 1077 (2000).

the plaintiffs' disability pensions reflects a change in the defendants' interpretation of the agreement. Nothing else had changed.

After deciding that the plaintiffs had standing to pursue their appeal,[4] the court concluded that the collective bargaining agreement was ambiguous about the applicability of the base pay cap to disability pensions. In light of that ambiguity, the court held that the board should not have recalculated the plaintiffs' retirement pay without evidence of record that, as a matter of fact, the agreement had been intended to impose such a pay cap. Finding none, the court sustained the plaintiffs' appeal.

## II

### ADMINISTRATIVE FINDINGS OF FACT

In their appeal to this court, the defendants challenge the validity of the trial court's appraisal of the administrative record that, in their view, supported the decision of the board that the collective bargaining agreement had always been intended to subject disability pensions to a base pay cap. The plaintiffs, however, urge us to affirm the court's judgment that the administrative record did not afford a substantial basis of fact for the board's reinterpretation of the agreement.

It is now common ground that the agreement was ambiguous with respect to the relationship between the provisions in the collective bargaining agreement that describe Option One service pension benefits on the one hand and disability pension benefits on the other. The parties also agree that it was proper for the court to attempt to resolve this ambiguity by searching the administrative record for evidence about the intent of the contracting parties. See *Regency Savings Bank* v.

---

[4] The defendants have not renewed their challenge to the plaintiffs' standing in their appeal to this court.

*Westmark Partners*, 70 Conn. App. 341, 345, 798 A.2d 476 (2002).

After the court examined the board's proceedings to determine whether evidence of record before the board supported its recalculation of the plaintiffs' disability pensions,[5] the court stated, in its memorandum of decision, that it had found no such evidence. The court therefore sustained the plaintiffs' administrative appeal. The defendants have appealed to this court from the judgment of the trial court.

A

The defendants argue that the judgment should be reversed because the court overlooked documentary evidence that was provided to the board by corporation counsel and explained by the city pension and benefits administrator. In addition, they maintain that the board conducted an investigation of its own. The administrative record does not support these contentions.

We have no reason to doubt that the board had access to the information described by the defendants. On the record, however, the board did not base its decision on that information. The fact that the pension and benefits administrator testified about her calculations *in the trial court* does not provide evidence, on the record, that she had presented such evidence to the board. The record does not document the defendants' claim that the board independently investigated the plaintiffs' claims.

Indeed, the administrative record, sparse as it is, strongly suggests that the board did not act on the basis of factual findings of any kind. At the public meeting, the board informed those present that the board would hear testimony opposing the disability pension recalcu-

---

[5] The defendants acknowledge that the retirement board is an administrative tribunal.

lations. Nevertheless, despite a subpoena from the plaintiffs seeking the testimony of the pension and benefits administrator, the board did not permit her to be questioned about the basis for the recalculations. Counsel for the city simply informed the board that the city had the legal right to recalculate pensions that inadvertently had failed to reflect a contractual cap on disability pension payments. In response, the chairman of the board stated: "[On] behalf of the city, I feel an obligation to follow the advice of my lawyer, and my lawyer is [counsel for the city] represented here . . . ." He told counsel for the plaintiffs to pursue "legal recourses to do what you will."

Although the chairman permitted counsel for the plaintiffs to address the board, no member of the board responded in any fashion to counsel's presentation. Neither the plaintiffs nor the defendants assert that counsel's statements were evidence of record.[6]

As the court found, this administrative record does not contain any factual evidence of any kind. The record is, however, entirely consistent with the candid statement of the chairman of the board, that the board,

---

[6] Counsel for the plaintiffs protested the recalculations on both procedural and substantive grounds. He maintained that the city improperly had modified pension rights before any such action had been taken by the retirement board. He represented that he had not had sufficient time to fully examine the documents that the city had provided to him and that some of the documentation was inaccurate. He argued that the city could not modify pensions retrospectively because each of the plaintiffs, when deciding whether to retire, had been given a pension worksheet prepared by the city that reflected the city's original position that disability pensions were not subject to base pay caps.

The appendix to the plaintiffs' appellate brief contains actual pension worksheets that support counsel's position. The worksheets were divided into three parts, "OPTION ONE PER ELECTION FORM UP TO JUNE 30, 1998 ONLY," "OPTION TWO," and "DISABILITY PENSION." The part of the form entitled "DISABILITY PENSION" had one line for "ANNUAL PAY (EITHER OPTION ONE OR TWO)" and a second line for "PERCENTAGE DETERMINED BY BOARD."

acting on behalf of the city, felt itself obligated to accept the legal conclusion of the assistant corporation counsel that the collective bargaining agreement authorizes recalculation of the plaintiffs' pension benefits. We may infer that the board recognized that it had no special expertise to evaluate the merits of a novel issue of law. The board did not need factual evidence to support the legal conclusion that it had been asked to endorse.

Even if, as the defendants assert, the administrative record were deemed to incorporate information supporting the recalculations supplied to the board by corporation counsel, that evidence would not suffice. The evidence on which the defendants rely did not purport to document the intent of the parties when they agreed upon the terms of the collective bargaining agreement. As the court aptly noted in its memorandum of decision, no one presented *any* evidence, on or off the record, before the board or to the court, about the intent of those who negotiated the agreement on behalf of the city.

Interpretation of the agreement by the present corporation counsel does not fill this evidentiary gap. As the plaintiffs note, corporation counsel did not assert that he had any knowledge, direct or indirect, about the city's 1995 negotiation posture with respect to disability pensions. Further, counsel did not explain why his current interpretation of the contract was more reliable, as a matter of fact, than the earlier interpretation of the contract by prior city agents at the time when the plaintiffs' disability pensions were calculated without a base pay cap. Presumably, the intent of the negotiating parties was more readily ascertainable then than in 2001.

## B

The defendants also argue that the decision of the board did not need to be supported by factual evidence

of record because "[t]he defendant city is a party to the contract, not the individual parties here, and it is clear that its intention was that the pay cap apply."[7] In effect, they argue that, whether the intent of the contracting parties is viewed as a question of law or of fact, manifestation of the city's present intent is dispositive. We disagree.

From the vantage point of a question of law, the record reveals that the city and the plaintiffs take disparate views of the meaning of the collective bargaining agreement. The defendants do not maintain, and have not established, that their revised reading of the agreement is one in which the union concurs. "The traditional rule requiring that courts consider the intentions of both parties in construing a contract is well settled. . . . This rule allows parties to enter into contractual arrangements with the confidence that they subsequently will not find themselves legally bound to unknown or unanticipated obligations." (Citations omitted.) *Grigerik* v. *Sharpe*, 247 Conn. 293, 311, 721 A.2d 526 (1998). "In contracts, other than purely unilateral contracts of donation that have never been acted upon by the donee, there are always at least two parties whose intention and understanding must be considered." 3 A. Corbin, Contracts (1960) § 538, pp. 56–57. The city's interpretation does not, therefore, resolve ambiguities in the agreement.

Viewed as a question of fact, the defendants' argument about the relevance of the city's intention is no more than a variation of their other arguments about the sufficiency of the factual record. Those arguments we have already addressed and rejected.

---

[7] Even if evidence of the city's intent had been available, it would not have sufficed. "In contracts, other than purely unilateral contracts of donation that have never been acted upon by the donee, there are always at least two parties whose intention and understanding must be considered." See 3 A. Corbin, Contracts (1960) § 538, pp. 56–57.

## C

In the absence of a factual administrative record supporting the city's recalculation of the plaintiffs' pensions, the defendants maintain that the plaintiffs cannot prevail because they failed to satisfy their own burden of proof. According to the defendants, the plaintiffs were required to present affirmative factual evidence of intent different from that expressed by corporation counsel at the public meeting of the board. We disagree.

An administrative appeal properly may challenge an administrative decision that is not supported by evidence of record. See, e.g., *JSF Promotions, Inc.* v. *Administrator, Unemployment Compensation Act,* 265 Conn. 413, 417, 828 A.2d 609 (2003); *Szewczyk* v. *Dept. of Social Services,* 77 Conn. App. 38, 50, 822 A.2d 957, cert. granted on other grounds, 265 Conn. 903, 829 A.2d 421 (2003). We know of no cases, and the defendants have cited none, that require an administrative appellant to supply evidence in support of a different administrative result.

## D

We conclude, therefore, that the trial court properly examined the administrative record of the proceedings before the board to inquire whether that record contained factual evidence of the intent of the parties who negotiated the terms of the collective bargaining agreement. Furthermore, we concur in the court's determination that the administrative record contained no such evidence.

## III

### INTERPRETATION OF THE CONTRACT AS A MATTER OF LAW

In the absence of evidence establishing the intent of the drafters of the collective bargaining agreement as

a matter of fact, we turn to interpretation of the agreement as a matter of law. The defendants urge us to acquiesce in the decision of the board for two reasons. They maintain that we owe deference to the board's interpretation of the agreement and that, even read independently, the agreement imposes pay caps on disability pensions.[8] We are not persuaded.

## A

The defendants argue that the board's interpretation of the collective bargaining agreement, viewed as a conclusion of law, was entitled to deference by the trial court and this court. We disagree.

Our law does not command universal judicial deference to administrative conclusions of law. In *MacDermid, Inc.* v. *Dept. of Environmental Protection*, 257 Conn. 128, 778 A.2d 7 (2001), a case on which the defendants rely, our Supreme Court recently reviewed the

---

[8] At oral argument in this court, the defendants reminded us that the trial court had not undertaken the task of interpreting the agreement as a matter of law. They urged us to do likewise. They maintained that an administrative appeal did not authorize this court to undertake independent analysis of an ambiguous collective bargaining agreement.

At trial, however, they recognized that the judicial role is not so limited. In their motion asking the court to permit the presentation of evidence supplemental to that presented to the retirement board, they stated: "The additional evidence will materially aid the court in its administrative review, promote justice and insure that the court has all relevant information before it that the [board] had when it made its determination rejecting Plaintiffs' claimed interpretation of the applicability of the pay cap provision. The underlying claim by the plaintiffs in this matter is more akin to a breach of contract than to a typical administrative review of a board's decision granting or denying benefits." Indeed, in their oral argument at trial, they urged the court to interpret the agreement in a manner consistent with application of the pay cap to disability pensions. They were right the first time.

If a court concludes that an administrative ruling of law is mistaken, the court has the responsibility to address the merits of the legal issue with which it is confronted. See, e.g., *Connecticut Light & Power Co.* v. *Texas-Ohio Power, Inc.*, 243 Conn. 635, 644, 708 A.2d 202 (1998). Were it otherwise, the issue would have to be relitigated in some other forum. The dictates of judicial economy counsel against following such a course.

applicable ground rules. "Even as to questions of law, [t]he court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. . . . Ordinarily, this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes. . . . *Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Furthermore, when . . . [an] agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference.*" (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 137. Like the defendants, we think it irrelevant, for present purposes, that the court was addressing an interpretation of a statute rather than a contract.

Applying *MacDermid, Inc.*, to this case, we are persuaded that the court was not required to defer to the board's interpretation of the pensions provisions of the collective bargaining agreement. As far as the record shows, the board was deciding "a pure question of law" on an issue that had "not previously been subject to judicial scrutiny." Our analysis of the agreement is similarly de novo.

B

"In determining whether a contract is ambiguous, the words of the contract must be given their natural and

ordinary meaning. . . . [A] contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." (Citations omitted; internal quotation marks omitted.) *United Illuminating Co.* v. *Wisvest-Connecticut, LLC*, 259 Conn. 665, 670–71, 791 A.2d 546 (2002).

Our point of departure is the conceded ambiguity in the terms of the collective bargaining agreement with respect to the relationship between two kinds of pensions to which a firefighter might be entitled. Article XXXIII of the agreement does not state, with clarity and certainty, whether disability pensions, like service pensions, are subject to a base pay cap.

Under these circumstances, we review the agreement in accordance with the customary rules of contract interpretation. "We do so mindful of the fact that, in the present case, we have a contract formed between two parties of relatively equal bargaining power. Under . . . well established principles, [a] contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." (Internal quotation marks omitted.) *Poole* v. *Waterbury*, 266 Conn. 68, 87–88, 831 A.2d 211 (2003).

As with any issue of contract interpretation, we look first to the language of article XXXIII of the collective

bargaining agreement. The relevant provisions are to be found in §§ 8 and 9, on the one hand, and in § 11 on the other.

Under §§ 8 and 9, service pension benefits[9] could be calculated according to one of two options. For retired firefighters like the plaintiffs in this case, who elected Option One, § 8 prescribed that "the maximum amount of a service pension shall be . . . an amount not to exceed said BASE PAY per the formulation set forth . . . in Section 9 hereof." In § 9, ¶ 375e, the term "base pay" is defined as salary, longevity pay, holiday pay and regular drivers pay at the time of retirement. The pensions administrator testified that, in practice, the base pay cap was 100 percent of base pay.

With respect to disability pensions under § 11 (also denominated ¶ 378), the agreement unambiguously provides for disability benefits[10] measured by a percentage of base pay, unrelated to years of service, with a "maximum . . . of seventy-six percent (76%) of BASE PAY."[11] Nowhere in § 11 does the agreement allude to a pay cap of any kind.

The ambiguity presented by the agreement is the textual linkage between §§ 9 and 11 in that part of § 11 that defines base pay by reference to "the provisions of Section 9 hereof . . . ." The defendants maintain that this cross-reference was intended to incorporate all of § 9, including the base pay cap that § 9 unambigu-

---

[9] Although the defendants resist this characterization of § 9 benefits, § 9 is introduced, in ¶ 373, as follows: "An employee with twenty (20) or more years of service is entitled to retire and receive a *service pension* regardless of his age." (Emphasis added.)

[10] Section 11 disability pension payments are subject to offsets for statutory pensions that a firefighter might receive under the Workers' Compensation Act, General Statutes § 31-275 et seq., or the Heart and Hypertension Act. Offsets are not an issue in the circumstances of this case.

[11] The plaintiffs' entitlement to the maximum awards of 76 percent of their base pay is not an issue in this case.

ously imposed on service pensions. The plaintiffs maintain, to the contrary, that the absence of an express cross-reference to a base pay cap was intended to indicate that disability pensions would not be subject to such a cap. We agree with the plaintiffs.

In our view, the text of article XXXIII, read as a whole, supports the award of disability benefits without a pay cap. Most important, we agree with the plaintiffs that we should attach significance to the absence of an express reference to a pay cap in § 11. The specificity with which article XXXIII spells out pension benefits cautions against judicial interpolation of language that the agreement does not contain. The agreement demonstrates that the drafters had no difficulty in spelling out pension caps when they wanted to impose them. It is not likely that they intended to impose pension caps by implication. Additionally, under ¶¶ 375a and 375b, the formula for calculation of Option One service pension benefits and the formula for calculation of the pension pay cap both took into account a firefighters' years of service. Years of service are not as directly relevant to a calculation of a disability pension benefit under § 11.

We are persuaded, furthermore, that our interpretation of the text of article XXXIII is consistent with the dictates of public policy. At first blush, it seems anomalous to suppose that the agreement would have contemplated the possibility that disability benefits, because uncapped, might sometimes exceed 100 percent of base pay, which is the measure of the pay cap. Upon further analysis, however, this discrepancy may simply reflect the fact that future job opportunities for retired firefighters may be considerably more constricted for those who retire on the ground of disability than for those who retire in good health. Taking account of the long-term consequences of disability is good public policy.

We conclude, therefore, that the trial court properly sustained the plaintiffs' appeal. Once the court determined that the collective bargaining agreement was ambiguous with respect to the calculation of disability pension benefits, the court properly examined the administrative record to determine whether it contained substantial factual evidence to resolve this ambiguity. As the plaintiff firefighters contended, the record did not contain such evidence. Furthermore, principles of contract interpretation support the plaintiffs' contention that, as a matter of law, the agreement entitled them to disability pension benefits without a pension pay cap.

The judgment is affirmed.

In this opinion the other judges concurred.

